UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KRISTEN REETZ, | CASE NO. C17-0084JLR |
| Plaintiff, | ORDER |
| v. | |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court are Plaintiff Kristen Reetz's and Defendant Hartford Life and

Accident Insurance Company's ("Hartford") cross motions for judgment under Federal

Rule of Civil Procedure 52, (Pl. Mot. (Dkt. # 29)); (Def. Mot. (Dkt. # 31).)  Each party

opposes the other's motion for judgment.  (Pl. Resp. (Dkt. # 33); Def. Resp. (Dkt. # 32).)

The court has considered the motions, the parties' submissions in opposition to and in

support of the motions, the administrative record, and the applicable law.  Being fully

advised,[1] the court grants Ms. Reetz's motion for judgment and denies Hartford's motion for judgment.[2]

## II.    FINDINGS OF FACT

This case arises from Hartford's denial of long-term disability ("LTD") benefits to Ms. Reetz. (*See* Compl. (Dkt. # 1) ¶¶ 5.2-5.3.) Ms. Reetz's medical history, as well as the facts behind Hartford's termination of LTD benefits, are long and complex. The court details the relevant facts below.

### A.    Initial Issuance of Disability Benefits

Ms. Reetz began working at Byram Health Care, Inc. ("Byram") as a senior customer service representative in October 1999. (Admin. Record ("AR") (Dkt. ## 21-23) at 1393.)[3] As described by Byram, this position is a sedentary level occupation, requiring six hours of sitting at a time, for a total of seven hours of sitting per day. (*Id.* at 1214; *see also id.* at 256 (Hartford describing the position as "involving

---

[1] Neither party requests oral argument, and the court determines that oral argument would not be helpful to its disposition of the motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] In accordance with Federal Rules of Civil Procedure 52(a), this order shall constitute the court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a); *see also A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *1 n.4 (W.D. Wash. Jan. 7, 2016). Although the court has not labeled paragraphs specifically as findings or conclusions, such labels are not necessary. The nature of the findings and conclusions that follow is apparent. *See Tri-Tron Int'l v. A.A. Velto*, 525 F.2d 432, 435-36 (9th Cir. 1975) ("We look at a finding or a conclusion in its true light, regardless of the label that the district court may have placed on it . . . [T]he findings are sufficient if they permit a clear understanding of the basis for the decision of the trial court, irrespective of their mere form or arrangement.") (internal citations omitted); *In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions of law.").

[3] The court cites to the page numbers at the bottom left of the administrative record.

sitting most of the time").)  Alternating sitting and standing as needed is not allowed.

(*Id.*)  There would be a 30-minute break during the eight-hour work day, and a typical

work-week consists of 40 total work hours, with 35 of those hours spent sitting.  (*See id.*)

While at Byram, Ms. Reetz participated in a LTD benefit plan, administered by

Hartford.  (AR at 33; *see generally id.* at 8-51.)  The Plan provides benefits to covered

employees who become disabled through sickness or accidental injury and defines

"disability" as:

> Disability or Disabled means You are prevented from performing one or
> more of the Essential Duties of:
> 1)      Your Occupation during the Elimination Period
> 2)      Your Occupation, for the 2 year(s) following the Elimination Period,
> and as a result Your Current Monthly Earnings are less than 80% of Your
> Indexed Pre-disability Earnings; and
> 3)      After that, Any Occupation.

(*Id.* at 21 (emphasis omitted).)  "Essential duties" are further defined as a duty that:

> 1)      Is substantial, not incidental;
> 2)      Is fundamental or inherent to the occupation; and
> 3)      Cannot be reasonably omitted or changed
> Your ability to work the number of hours in Your regularly scheduled work
> week in an Essential duty.

(*Id.*)  "Your Occupation" does not mean the specific job that the claimant is performing

for a specific employer at a specific location; rather, it is the job that is recognized in the

general workplace.  (*Id.* at 24.)  "Any Occupation," however, means any job for which

the claimant is qualified, by education, training, or experience.  (*Id.* at 21.)  Thus, the

Plan offers benefits for the 90-day elimination period and the two years following that

period if the claimant cannot perform the essential duties of his or her own occupation.

But after those two years, the Plan will only pay benefits if the claimant is unable to

perform the essential duties of any occupation for which he or she is qualified.  The

parties agree that the Plan is an employee benefit plan within the meaning of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

(Compl. ¶ 4.6; *see* Def. Mot. at 7.)

Ms. Reetz remained at Byram until March 2014, when she took leave due to

persistent pain resulting from fibromyalgia and spondyloarthropathy.[4]  (AR at 1450.)

Ms. Reetz submitted a claim for benefits under the Plan on March 10, 2014, and Hartford

paid short-term disability ("STD") benefits from March 7, 2014 to June 5, 2014.  (*Id.* at

1450, 1452.)  It is unclear from Hartford's communication what the basis was for these

STD benefits.  (*See id.* at 1452-53.)  However, Ms. Reetz was being treated by Dr. Sue

Romanick for persistent pain in her lower back, hips, and joints.  (*See, e.g.*, *id.* at 1495.)

Dr. Grace Chapman further recognized that Ms. Reetz's health issues were contributing

to severe depression and anxiety.  (*Id.* at 1487.)

In June 2014, Hartford began investigating Ms. Reetz's claim for LTD benefits.

(*Id.* at 1392-1406.)  By this point, Ms. Reetz had also undergone knee surgery in the

spring of 2014 and fell on that knee during recovery in late May, aggravating the injury.

(*Id.* at 1364-65; 1360 (noting "new re-aggravation" with the right knee).)  Dr. Cherylann

Brown, Ms. Reetz's therapist, further diagnosed her with major depressive disorder.  (*Id.*

//

---

[4] Fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue
components of muscles, tendons, ligaments, and other tissue.  *Benecke v. Barnhart*, 379 F.3d
587, 589 (9th Cir. 2004).  Spondyloarthropathy refers to an inflammatory arthritis involving the
axial spine.  *See* Inflammatory (rheumatoid) arthritis, 3 Soc. Sec. Law & Prac. § 42:93.

at 1385.)  Additionally, Ms. Reetz's back pain persisted.  Dr. Carolyn Marquadt, Ms.

Reetz's primary treating physician, commented that Ms. Reetz "has trouble with sitting or

standing" and that her back pain has "more recently . . . been flared up." (*Id.* at 1061.)

Hartford approved LTD benefits on June 23, 2014 (*id.* at 457), and paid LTD benefits to

Ms. Reetz through April 2016 "because [she was] unable to perform the duties of [her]

[o]ccupation due to symptoms and impairments resulting from symptoms for [her] back

and fibromyalgia" (*id.* at 338).

**B.  Ms. Reetz's Medical Condition from June 2014 to May 2016**

During the time she received LTD benefits, Ms. Reetz continued to seek treatment

for her fibromyalgia and spondyloarthropathy.  The court reviews Ms. Reetz's medical

history for the years 2014, 2015, and the first half of 2016 leading up to termination.

1. Ms. Reetz's Medical Condition in 2014 and 2015

On December 8, 2014, Dr. Romanick observed that Ms. Reetz had "alot [sic] of

back and SI[5] joint pains, upper back pain . . . and left shoulder pains."[6]  (*Id.* at 1052.)  Dr.

Romanick again noted on March 8, 2015, that Ms. Reetz's "fibromyalgia is flaring and

associated with debilitating pains and inability to sleep." (*Id.* at 1050.)  In May 2015,

//

---

[5] "SI" refers to Sacroiliac joint pain, which is pain located in the lower back, where the spine meets the pelvis. *See Rodriguez v. Colvin*, No. EDCV 13-1357-JPR, 2014 WL 3955191, at *5 n.12 (C.D. Cal. Aug. 13, 2014).

[6] Ms. Reetz was also seen for possible gall bladder disease, and her gall bladder was eventually removed laparoscopically. (*See* AR at 1157, 1163-64, 1172-73.)  Because she has not premised her disability on this gastrointestinal disorder, the court does not go into detail about this portion of her medical history.  (*See* Pl. Resp. at 18 (conceding that Ms. Reetz "has not alleged disability due to any gastrointestinal disorder").)

Ms. Reetz self-reported that her low back pain was worse; sitting aggravated the pain, whereas laying down relieved the pain. (*Id.* at 1066.)

Over the summer of 2015, Ms. Reetz received L5-S1 facet injections—injections of medicine into the small joints of the lower back for pain relief. (*See id.* at 1017.) Dr. Marquadt reports that these injections reduced Ms. Reetz's pain "by about 50%," but that by July 2015, "the symptoms [were] slowly coming back." (*Id.* at 1017-18.) At that point, Ms. Reetz "still [could not] sit for long periods of time." (*Id.* at 1018.) By August 2015, Dr. Marquadt reports that Ms. Reetz's "back has been worse," that her "pain is 9 out of 10," and that she "has trouble with sitting, standing, or walking for long periods of time." (*Id.* at 1022.) Because Ms. Reetz's "pain is more severe," Dr. Marquadt administered a Toradol injection to "help with some of her discomfort." (*Id.* at 1022-23.)

Dr. Marquadt referred Ms. Reetz to Dr. Jennifer Lee at the Swedish Pain Center, and Dr. Lee evaluated Ms. Reetz on November 20, 2015. (*Id.* at 966-72.) Dr. Lee wrote that Ms. Reetz's pain "has been steady in severity" and is "aggravated by prolonged standing, sitting or laying on her back." (*Id.* at 966.) Dr. Lee recommended "bilat L3, L4, L5 medical branch blocks," a procedure where an anesthetic is injected near small medial nerves that are connected to the facet joints to determine whether the facet joint is the source of the pain. (*Id.* at 972.) Dr. Marquadt reviewed this recommendation when she saw Ms. Reetz for a follow-up on December 3, 2015. (*See id.* at 955.) Dr. Marquadt, through her physical examination, noted that Ms. Reetz has "a lot of pain through the suboccipital ridge" with "[t]ension through the neck, upper trapezius, levator scapulae, and rhomboids." (*Id.*) Dr. Marquadt again indicated that her impression was "1. Lumbar

facet arthropathy.  2. Spondyloarthropathy. 3. Cervicogenic and muscle tension headaches. 4. Fibromyalgia." (*Id.*)

   2.  Ms. Reetz's Medical Condition in 2016

   By 2016, Ms. Reetz's pain seemed to increase.  On January 5, 2016, Dr. Chapman noted that despite low-impact exercise, Ms. Reetz reports her pain "has increased the past 3 weeks." (*Id.* at 835.)  On January 20, 2016, Dr. Thomas Erdmann, Ms. Reetz's new primary care physician, assessed her to be suffering from chronic pain, fibromyalgia, and lumbar facet joint pain.  (*Id.* at 838.)  Dr. Erdmann documented Ms. Reetz's pain as "constant with exacerbations, aching, throbbing, shooting, stabbing, [and] burning in nature" that "is worse with sitting and walking." (*Id.* at 840.)  On January 29, 2016, Ms. Reetz returned to Dr. Marquadt for another Toradol injection.  (*Id.* at 740-41.)  Dr. Marquadt describes Ms. Reetz's pain as "very flared up" (*id.* at 741), elaborating:

> Since I saw her last, her back is quite severe.  Today it is 9 out of 10.  She cannot move.  It is achy.  It is constant.  She does not get pain going into the lower extremities.  She is getting some aching into her buttock.  She has trouble with sitting or standing.

(*Id.* at 739.)

   In March 2016, Dr. Marquadt followed up with Ms. Reetz after Ms. Reetz had received a radiofrequency neurotomy, an injection procedure where electrically produced heat is applied to compressed nerves in an attempt to interrupt pain signals to and from the brain.  (*Id.* at 749.)  Dr. Marquadt again noted that Ms. Reetz seemed to have trouble sitting, bending, or twisting and that she is "somewhat more despondent today due to discomfort." (*Id.* at 750.)  Although the radiofrequency had helped, "her overall function

has not improved to the point where she can tolerate sitting for more than half an hour at a time." (*Id.* at 751.)

By late April, Ms. Reetz reported to Dr. Marquadt that she experiences "a really bad pinching/stabbing feeling" that "stops [her] from moving[,] it hurts so bad." (*Id.* at 755.) If she "sit[s] for almost any amount of time, [she] go[es] numb all the way to [her] right foot." (*Id.*) Overall, Ms. Reetz reported that "it's just getting worse." (*Id.*) Dr. Marquadt advised her to make an appointment if the pain persisted. (*Id.*) On April 20, 2016, Ms. Reetz saw Dr. Erdmann for a follow-up appointment on her chronic pain. (*Id.* at 858.) She reported that her pain is "constant" and is "worse with sitting, standing, twisting and bending." (*Id.*)

Ms. Reetz also continued to seek physical therapy treatment for her knee pain. On April 4, 2016, she reported to her physical therapist, Ms. Alison Read, that her "[k]nee is hurting pretty good today. Yesterday was laundry day (up and down stairs)." (*Id.* at 876.) The physical therapist included in her notes that Ms. Reetz was "[f]eeling a fibromyalgia flare up." (*Id.*) Later that month, on April 29, 2016, Ms. Reetz reported that her "[k]nee is feeling great" and that she had no problems running errands at both Costco and Walmart the previous day. (*Id.* at 590.) However, she also reported that she is "[f]eeling [a] fibro flare." (*Id.*)

On May 4, 2016, Ms. Reetz saw Dr. Erdmann and reported that she is "experiencing increasing pain in her back, as well as legs and foot, from Fibromyalgia and spondyloarthropathy." (*Id.* at 863.) Similarly, on May 6, 2016, Ms. Reetz notified Ms. Read that her "pain overall is unchanged in the last couple months" and that sitting

and standing are aggravating factors. (*Id.* at 591-92.)  Ms. Read noted on that date that Ms. Reetz suffers from "back pain that is aggravated with all motions of direction." (*Id.* at 594.)  Ms. Reetz then saw Dr. Marquadt on May 11, 2016.  Dr. Marquadt indicated that "things have been worse" (*id.* at 761):  Ms. Reetz "cannot sit for long periods of time," "has to lie down with her feet elevated," and "is having a lot of difficulty with the combination of her lumbar issues, as well as her fibromyalgia" (*id.* at 762-63).

**C.  Hartford's Review and Termination of Ms. Reetz's Benefits**

Meanwhile, from 2014 to 2016, Hartford was actively evaluating Ms. Reetz's qualification for LTD benefits after its initial approval in June of 2014.  In this section, the court details Hartford's denial of LTD benefits, Ms. Reetz's award of Social Security disability ("SSD") benefits, and Ms. Reetz's appeal of Hartford's denial.

1.  <u>Evaluation and Initial Denial of LTD Benefits</u>

As a part of its evaluation, Hartford collected several physician statements in addition to the medical history detailed above.  On June 24, 2014, Dr. Chapman expressed her opinion that the restrictions and limitations keeping Ms. Reetz from working were specific to the environment at Byram and that Ms. Reetz could work for another employer.  (*Id.* at 1357.)  On July 15, 2014, Dr. Rujisaki, who oversaw Ms. Reetz's knee surgery, submitted an Attending Physician's Statement ("APS") stating that Ms. Reetz had a degenerative disease and that she was able to sit for three to four hours at a time.  (*Id.* at 708.)  On September 8, 2014, Dr. Romanick submitted a Physical Capacities Evaluation, finding that Ms. Reetz can sit and stand for a total of six hours a day, with "frequent breaks to stand up and walk." (*Id.* at 1098.)

But in 2015, Hartford received differing information. Dr. Marquadt submitted an APS of Continuing Functionality on August 14, 2015. (*See id.* at 1040-41.) On that form, Dr. Marquadt indicates that Ms. Reetz suffers from spondyloarthropathy, lumbar back pain, and fibromyalgia. (*Id.* at 1040.) Because of this, Dr. Marquadt states that Ms. Reetz can only sit for 30 minutes at a time, for a total of four to six hours a day. (*Id.* at 1041.) She can occasionally lift one to ten pounds and rarely lift up to 20 pounds. (*Id.*) She can rarely bend at the waist, kneel, or crouch, and she can occasionally reach above or below shoulder level and perform fingering or handling tasks. (*Id.*)

Six months later, on February 22, 2016, Dr. Marquadt responded to a request for supplemental information by Hartford. (*See id.* at 723-24.) Hartford required clarification on what findings "prevent Ms. Reetz from being able to sit for 2 hours at a time for a total of 6 hours in an 8 hour day." (*Id.* at 723.) Dr. Marquadt pointed to Ms. Reetz's "severe facet arthropathy" and muscle spasms in the lumbar area, including Ms. Reetz's weak core, limited lumbar flexion, and limited lumbar extension abilities. (*Id.*) Dr. Marquadt reaffirmed that Ms. Reetz could sit for 30 minutes at a time for a total of four to six hours a day. (*Id.*) Hartford additionally inquired as to Dr. Marquadt's conclusion about Ms. Reetz's reaching and handling abilities. (*Id.*) Dr. Marquadt cited Ms. Reetz's carpal tunnel and fibromyalgia. (*Id.*) Lastly, Hartford asked whether Ms. Reetz has "the functional ability to perform the function . . . on a consistent basis for 8 hours per day for 5 days per week." (*Id.* at 724.) Dr. Marquadt responded "no," pointing to Ms. Reetz's fibromyalgia, muscle tightness, fatigue, weakness, spondyloarthropathy, and severe lumbar arthropathy. (*Id.*)

Hartford obtained an independent peer review from Dr. Prerna Khanna, who reviewed Ms. Reetz's medical records and physician APS. (*See id.* at 704-13.) In a report dated March 28, 2016, Dr. Khanna states that she reviewed records "that spanned from January 3, 2014 to August 14, 2015." (*Id.* at 704.) She did not personally examine Ms. Reetz. (*See id.* at 704-13.) Dr. Khanna reports that she spoke with Dr. Marquadt, who communicated her impression that Ms. Reetz is credible. (*Id.* at 711.) Dr. Marquadt purportedly told Dr. Khanna that Ms. Reetz is "afraid to go back to work, because she is deconditioned. She does not exercise at all . . . [and] is, in general, feeling weak and sore all over." (*Id.*) Dr. Marquadt, however, denies that this conversation occurred and can find no record of the call in her office logs. (*Id.* at 762 ("I did not speak to this physician, and there is no documentation of any contact or phone calls in the computer.").)

Dr. Khanna concluded that she "agree[d] with . . . [Dr. Marquadt's] assessment of August 14, 2015, where she stated that [Ms. Reetz] can walk, stand and sit for 30 minutes at a time . . . up to six hours a day for sitting." (*Id.* at 711.) Dr. Khanna also "agree[d] with the restrictions that [Ms. Reetz] can . . . lift/carry/push/pull up to 10 pounds on a frequent basis." (*Id.*) Dr. Khanna stated that Ms. Reetz "is capable of performing the functions outlined for eight hours per day, 40 hours per week." (*Id.* at 712.) Lastly, Dr. Khanna noted that Ms. Reetz's condition and functionality "are not expected to improve because of the claimant's chronic diagnoses of fibromyalgia and degenerative joint disease with facet arthropathy." (*Id.*)

Christina Fleisher, a Vocational Case Manager, prepared an Employability Analysis Report ("EAR") based upon Dr. Khanna's report. (*Id.* at 663-65.) An EAR

allows one to input certain qualifications or limitations and subsequently performs a

search for available occupations that match those specifications. (*See* Pl. Mot. at 8 n.5.)

Utilizing the restrictions detailed by Dr. Khanna, Ms. Fleisher searched for jobs where

the strength needed was "LIGHT" and reaching, handling and fingering activities were

"constantly" performed. (*Id.* at 664.) "All remaining Physical Demands . . . remained at

Pre-disability levels as there was nothing to indicate otherwise." (*Id.*) Ms. Fleisher then

eliminated from the results any job that "involve[s] standing and walking over 2 hours

total/day" or requires additional training or experience. (*Id.*) Ms. Fleisher subsequently

concluded that there were at least ten occupations that Ms. Reetz could perform; the

identified occupations were sedentary occupations, involving sitting and clerical work.

(*See id.* at 665-700.)

      Utilizing this information, Hartford found that Ms. Reetz was no longer disabled

as defined in the Plan. (*Id.* at 335-41.) In its April 28, 2016, letter terminating Ms.

Reetz's benefits, Hartford describes the essential duties of "Your Occupation": "[Y]ou

must be able to push or pull up to 10 pounds frequently. You must be able to do sitting

most of the time." (*Id.* at 338.) Characterizing Dr. Khanna as having concluded that Ms.

Reetz "can sit for 30 minutes at a time for a total of 6 hours a day" for "8 hours per day

for 40 hours per week," Hartford concluded from the combination of all the medical

information in the file that Ms. Reetz can "push our [sic] pull up to 10 pounds frequently"

and can "do sitting most of the time." (*Id.* at 329.) As such, Hartford concluded that "the

medical information does not support you[r] inability to perform the essential duties of

your Own Occupation." (*Id.*) Hartford further described the EAR, which "showed that

there are a number of occupations for which you are qualified that are within your physical capabilities." (*Id.* at 340.) Therefore, Hartford additionally concluded that Ms. Reetz is "not prevented from performing the essential duties of your Own or Any Occupation." (*Id.*)

2. Ms. Reetz's SSDI Benefits Award

As required by the Plan, Ms. Reetz had applied for Social Security Disability ("SSDI") benefits after receiving LTD benefits from Hartford. (*See id.* at 18, 1207.) Hartford assisted Ms. Reetz in her SSDI application by referring her to Doherty Cella Keane, a firm that specializes in SSDI matters. (*Id.* at 449, 1203, 1208.) Ms. Reetz's SSDI application, as well as her Request for Reconsideration, were initially denied. (*See id.* at 1083, 1197, 1204-06.) Ms. Reetz, with help from the attorneys provided by Hartford, sought a hearing, which was scheduled for May 26, 2016. (*See id.* at 714.)

On June 29, 2016, after the hearing, Administrative Law Judge ("ALJ") Gordon W. Griggs found that Ms. Reetz was disabled as of March 7, 2014, under the Social Security Administration's ("SSA") rules. (*Id.* at 565-69.) Accordingly, the SSA awarded Ms. Reetz retroactive benefits beginning September 2014. (*See id.* at 541.) Because the SSDI benefits offset Hartford's payment of LTD benefits (*id.* at 1208), Hartford notified Ms. Reetz that it had overpaid her LTD benefits by $30,817.99 and requested repayment (*id.* at 321-23).

3. Ms. Reetz's Appeal

Ms. Reetz appealed Hartford's decision on May 9, 2016. (*Id.* at 634-35.) Dr. Marquadt asserts in her May 11, 2016, medical notes that after review of the disability

paperwork, she does not agree with Dr. Khanna's assessment, "as what [Dr. Marquadt] had signed off on did not equal an 8-hour day." (*Id.* at 762.) Dr. Marquadt further states that she disagrees with the disability assessment (*id.* at 763) and submitted another APS that same day (*see id.* at 632-33).

This second APS submitted by Dr. Marquadt on May 11, 2016, sends mixed signals. On one hand, Dr. Marquadt indicates that Ms. Reetz could sit for four hours at one time and circled no number when asked for the total hours that Ms. Reetz could sit. (*See id.* at 633.) On the other hand, Dr. Marquadt remarks that Ms. Reetz's current status was "unchanged." (*Id.*) Dr. Marquadt also indicates that Ms. Reetz can only occasionally lift up to ten pounds and only occasionally perform upper extremity activity such as keyboard tasks, grasping, or reaching. (*Id.*)

As a part of the appeal process, Hartford sent Ms. Reetz's records to three independent medical officials for peer review. (*Id.* at 326.) Of these three, Dr. Elena Schiopu was board certified in rheumatology and commented on Ms. Reetz's fibromyalgia and spondyloarthropathy.[7] (*See id.* at 518-22.) Dr. Schiopu reviewed all of Ms. Reetz's medical records up through May 2016 (*id.* at 518-19) and concluded that since April 28, 2016, Ms. Reetz can "sit continuously, without any limitations." (*Id.* at

---

[7] Because gastroenterologist Dr. Alexander Shapsis and psychiatrist Dr. Steven Dyckman do not comment on fibromyalgia and spondyloarthropathy—the medical issues pertinent to the court's review—the court does not delve into their reports. *See Eisner v. The Prudential Ins. Co. of Am.*, 10 F. Supp. 3d 1104, 1116 (N.D. Cal. 2014) (finding a report regarding psychiatric impairment "immaterial" when claimant did not contend that she suffered from such an impairment). It suffices to say that from a gastroenterological and psychological perspective, the two did not find that Ms. Reetz had any limitations. (*See* AR at 523-30.)

522.)  Dr. Schiopu also concludes that Ms. Reetz can "reach in all planes, perform fine finger manipulations and fine and strong grip without limitations," and "lift 10 pounds frequently."  (*Id.*)  However, Dr. Schiopu notes that Ms. Reetz should be "allowed to change positions at least every 30 minutes for comfort."  (*Id.*)

Based on these independent reviews, Hartford upheld its determination that Ms. Reetz was not "disabled" within the meaning of the Plan.  (*Id.* at 324-29.)  Hartford concluded that Ms. Reetz is "capable of functioning at a sedentary to light physical demand level on a full time basis with the restrictions and limitations noted above."  (*Id.* at 327.)  And although the SSA's disability determination was a relevant piece of evidence, Hartford noted that the "SSA's determination is not conclusive."  (*Id.* at 328.)  Hartford emphasized that the SSA operates under a different standard, may weigh subjective evidence differently, and may have different medical evidence in the record before it.  (*Id.* at 328-29.)  Accordingly, it upheld its decision to terminate Ms. Reetz's LTD benefits.  (*Id.* at 328.)

Ms. Reetz subsequently filed suit under ERISA, and both parties request judgment on the administrative record under Rule 52.  (*See* Pl. Mot. at 9; Def. Mot. at 1); *see Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).  The court now addresses both motions.

### III.    CONCLUSIONS OF LAW

**A.    Legal Standard**

ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to

enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The parties do not dispute that Ms. Reetz, as a participant under a qualifying ERISA plan, is entitled to bring this suit under ERISA. (*See* Pl. Mot. at 4; Def. Mot. at 7.)

Both parties have elected to proceed pursuant to Federal Rule of Civil Procedure 52, under which the court conducts "what is essentially a bench trial on the record." *See Minton v. Deloitte and Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1218 (N.D. Cal. 2009). When considering a Rule 52 motion for judgment, the court will ask "not whether there is a genuine issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *Kearney*, 175 F.3d at 1095. The court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.* Thus, when considering a Rule 52 motion for judgment in an ERISA benefits case, the court may make factual findings, evaluate credibility, and weigh the evidence before it to determine whether the administrator correctly or incorrectly denied benefits. *See Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1231 (W.D. Wash. 2015); *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1250 (N.D. Cal. 2014).

Both parties additionally agree to *de novo* review. (*See* Pl. Mot. at 10; Def. Mot. at 7.) On *de novo* review, the administrator's decision receives no deference. *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). Instead, the court conducts an "independent and thorough inspection of an administrator's decision" to

1 determine in the first instance if the claimant has adequately established that he or she is

2 disabled under the terms of the plan. *Silver v. Exec. Car Leasing Long-Term Disability*

3 *Plan*, 466 F.3d 727, 733 (9th Cir. 2006); *Muniz* 623 F.3d at 1295-96. Generally, that

4 review is limited to the evidence contained in the administrative record. *Opeta v. Nw.*

5 *Airlines Pension Plan for Contract Emp.*, 484 F.3d 1211, 1217 (9th Cir. 2007). In

6 evaluating the persuasiveness of each party's case, the court necessarily must make

7 reasonable inferences where appropriate. *Oldoerp*, 12 F. Supp. 3d at 1251. The claimant

8 has the burden of showing by a preponderance of the evidence his or her entitlement to

9 benefits. *Id.* at 1250-51; *Muniz*, 623 F.3d at 1294.

10 **B.      Application to Ms. Reetz**

11        Because of when Ms. Reetz's benefits were terminated, there are two definitions

12 of "disabled" under the Plan that are applicable here. From April 27, 2016, to June 5,

13 2016, Ms. Reetz still fell within Hartford's two-year period when a "disability" is defined

14 as the inability to perform her own occupation, such that her monthly earnings were less

15 than 80% of her indexed pre-disability earnings. (*See* AR at 21, 335, 1452; *see also* Def.

16 Mot. at 7.) Thus, to qualify for benefits during this time frame, Ms. Reetz must establish

17 that she was prevented from performing the essential duties of her own job. But, after

18 June 6, 2016, the definition of "disability" shifts and becomes the inability to perform any

19 occupation for which Ms. Reetz is qualified by education, training, or experience. (*See*

20 AR at 21; Def. Mot. at 7.) Thus, to qualify for benefits after June 6, 2016, Ms. Reetz

21 must establish that she was prevented from performing one or more essential duties of

22 any occupation. Based on the record before it, the court does not believe that Ms. Reetz

could perform either the essential duties of her own occupation or the essential duties of any occupation for which she is reasonably qualified.

1. Own Occupation

Ms. Reetz must first establish by a preponderance of the evidence that a sickness prevented her from performing the essential duties of her own job from April 28, 2016 to June 5, 2016. (Def. Mot. at 7; *see* AR at 21.) The court finds that Ms. Reetz has met this burden and is thus entitled to the restoration of her LTD benefits for this period.

It is clear from the record that Ms. Reetz's job as a senior customer service representative was a sedentary level occupation and therefore required her to be able to sit for long periods of time. For instance, Byram described her position to require six hours of sitting at a time for a total of seven hours of sitting per day.[8] (AR at 1214.) Hartford categorized Ms. Reetz's job as one that required her to be "sitting most of the time" with "occasional walking/standing for brief periods." (*Id.* at 256.)

But doctors who personally examined Ms. Reetz, including Dr. Marquadt, Dr. Erdmann, and Dr. Lee, concluded that Ms. Reetz cannot sit for prolonged periods of time due to chronic pain and that sitting aggravates her pain. (*See* AR at 739, 750-51, 762-63, 840, 966, 1018.) For instance, over the summer in 2015, Dr. Marquadt reported that Ms. Reetz "sill [could not] sit for long periods of time." (*Id.* at 1018.) In August 2015, Dr. Marquadt remarked that Ms. Reetz had "trouble with sitting . . . for long periods of time."

---

[8] The court recognizes that "Your Occupation" does not mean the specific position at Byram that Ms. Reetz previously worked at (*see* AR at 24) but refers to Byram's description of the position as an illustration of what the job generally entails.

1  (*Id.* at 1022.)  Dr. Lee concurred, noting that Ms. Reetz's pain is "aggravated by

2  prolonged sitting."  (*Id.* at 966.)  Dr. Erdmann assessed Ms. Reetz's pain to be "constant"

3  and "worse with sitting."  (*Id.* at 840.)  These reports of Ms. Reetz's pain are

4  corroborated by the various injections she underwent, including two Toradol injections, a

5  radiofrequency neurotomy, L5-S1 facet injections, and medical branch blocks in the L3,

6  L4, and L5 vertebrae.  (*See id.* at 740-41, 749, 972, 1017, 1022-23.)  Dr. Marquadt

7  additionally remarked twice—once in August 2015, and again in February 2016—that

8  Ms. Reetz can only sit for 30 minutes at a time for a total of no more than six hours a day.

9  (*See id.* at 723, 1040-41.)  Dr. Khanna, Hartford's reviewing physician, agreed with these

10  limitations on sitting.  (*See id.* at 711.)  This evidence, establishing Ms. Reetz's inability

11  to sit for prolonged periods of time, is persuasive that Ms. Reetz cannot do her own

12  occupation, which requires sitting for the majority of the time.  Thus, on this basis alone,

13  Ms. Reetz is more likely than not disabled under the Plan.

14      Lifting ability is another indication that Ms. Reetz is unable to perform her own

15  occupation.  Hartford admits that to perform the essential duties of her job, Ms. Reetz

16  must be able to "push or pull up to 10 pounds frequently."  (*Id.* at 338.)  But Dr.

17  Marquadt has consistently concluded that Ms. Reetz can only "occasionally" lift up to ten

18  pounds.  (*See id.* at 633, 1041.)  There is no explanation for why Hartford concluded

19  instead that Ms. Reetz can perform this function frequently when the information from

20  her treating physician demonstrates otherwise.

21      Moreover, the court finds no evidence of improvement in Ms. Reetz's condition

22  since Hartford previously found that Ms. Reetz was disabled.  An administrator's past

payment of benefits does not "operate[] forever as an estoppel so that an insurer can never change its mind." *Muniz*, 623 F.3d at 1296. However, because Hartford had awarded LTD benefits for almost two years, "one would expect the [evidence] to show an *improvement*." *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008). This requirement imposes no burden on the insurer, but is instead a logical inference that the court may make based on a specific set of facts. *Schramm v. CNA Fin. Corp. Insured Grp. Benefits Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010). Here, Hartford awarded Ms. Reetz both STD and LTD benefits—for almost two years—on account of her fibromyalgia and back pain (*see* AR at 338), which strongly suggests that she was disabled. Thus, the court expects to see evidence of improvement in the period of time leading up to April 2016, when Hartford determined Ms. Reetz was no longer disabled. *See Bledsoe v. Metro. Life Ins.*, 90 F. Supp. 3d 901, 910 (C.D. Cal. 2015) (expecting to see "some evidence of [the claimant's] medical progression at the time of [the administrator's] termination of LTD benefits" because the administrator had awarded STD and LTD benefits for nearly three years).

Hartford maintains that Ms. Reetz saw improvement in her functionality from March 2014 to April 2016. (Def. Mot. at 8; Def. Resp. at 3-4.) The court disagrees. In fact, the record evinces that Ms. Reetz's chronic pain remained, at best, unchanged, and may have worsened. Her treating physicians' medical records demonstrate this decline. In July 2015, Dr. Marquadt remarked that Ms. Reetz's symptoms were "slowly coming back," and one month later, Dr. Marquadt reports that her back "has been worse." (AR at 1017-18, 1022.) In January 2016, Dr. Chapman notes that Ms. Reetz reports her pain had

increased in the past three weeks. (*Id.* at 835.) By the end of January, Dr. Marquadt

notes that her back "is quite severe" with pain rated "9 out of 10." (*Id.* at 739.) In March

2016, Dr. Marquadt explicitly noted that Ms. Reetz's "overall function has not improved

to the point where she can tolerate sitting for more than half an hour at a time." (*Id.* at

751.) By April, Ms. Reetz described how she would go numb down to her right foot if

she sat for almost any amount of time, summarizing that "it's just getting worse." (*Id.* at

755.)

In May 2016, several treating physicians noted increasing pain. Dr. Erdmann

stated that Ms. Reetz was experiencing increasing pain in her back, as well as legs and

her foot. (*Id.* at 863.) Ms. Read commented that Ms. Reetz's back pain "is aggravated

with all motions of direction." (*Id.* at 594.) Dr. Marquadt's notes in May succinctly

summarize the situation: "[T]hings have been worse." (*Id.* at 761.) Ms. Reetz "is having

a lot of difficulty with the combination of her lumbar issues, as well as her fibromyalgia."

(*Id.* at 762-63.) In light of the fact that these physicians, especially Dr. Marquadt, treated

Ms. Reetz more recently and more often than any other medical professional in the

record, and considering the consistency of their observations that Ms. Reetz's condition

did not show significant improvement, their conclusions are especially persuasive.

The APS forms received by Hartford paint a similar picture of decline. In July

2014, Dr. Rujisaki opined that Ms. Reetz could sit for three to four hours at a time;

similarly, in September 2014, Dr. Romanick believed that Ms. Reetz could sit for a total

of six hours with frequent breaks. (*Id.* at 708, 1098.) But by 2015, Dr. Marquadt

concluded that Ms. Reetz could only sit for half an hour at a time for a total of four to six

hours a day. (*Id.* at 1041.) Dr. Marquadt reiterated these limitations in February 2016, explaining that because of her "severe facet arthropathy" and other lumbar area limitations, Ms. Reetz could only sit for 30 minutes at a time for four to six hours a day. (*Id.* at 723.)

Indeed, many physicians, including Hartford's independent physicians, express that improvement is not likely with Ms. Reetz's diagnoses. (*See id.* at 712 (Dr. Khanna commenting that Ms. Reetz's "functionality [is] not expected to improve because of [her] chronic diagnoses of fibromyalgia and degenerative joint disease with facet arthropathy"); *id.* at 522 (Dr. Schiopu commenting that Ms. Reetz's limitations "should be lifelong" due to her "irreversible joint damage"); *id.* at 633 (Dr. Marquadt commenting in May 2016, that Ms. Reetz's condition is "unchanged"); *id.* at 706-07 (Dr. Chapman stating "Don't expect any improvement").) These degenerative conditions were not expected to improve over time, and the lack of consistent improvement, as recorded in both the medical records and insurance forms, lends support for Ms. Reetz's position. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

Hartford does not dispute the medical record described above. Instead, it rests primarily on Dr. Marquadt's May 2016, APS—more specifically, on one question within

//

//

that form—for its contention that Ms. Reetz has improved.[9]  (*See* Def. Mot at 8; Def.

Resp. at 3-4.)  When asked about the restrictions on sitting, Dr. Marquadt circled "4" for

number of hours at one time and did not circle a number for total hours of sitting per

day.[10]  (*See* AR at 633.)  Hartford interprets the lack of response as Dr. Marquadt

"impos[ing] no restriction on the total number of hours that Ms. Reetz could sit in an 8

hour work day." (Def. Mot. at 8.)  Thus, Hartford contends that Ms. Reetz improved

from being able to sit for 30 minutes at a time for a total of four to six hours a day, to

being able to sit for four hours at a time for eight hours a day.  (*Id.*)

　　　　The court does not find this one response as compelling as Hartford does.  At the

outset, the failure to circle a number does not conclusively indicate the ability to work an

eight-hour day.  If Dr. Marquadt wanted to indicate that Ms. Reetz could work eight

hours, she could have circled the "8," an option on the form.  (*See* AR at 633.)  But

instead, Dr. Marquadt circled nothing at all; at best, the court finds this omission

ambiguous.  Moreover, Hartford's interpretation is inconsistent with other answers on the

APS.  If Ms. Reetz were able to sit for four hours at a time for a total of eight hours, Dr.

Marquadt could not have answered that her current status is "unchanged."  (*See id.*)

---

[9] The court notes that this APS was submitted during the course of Ms. Reetz's appeal and thus could not have informed Hartford's initial denial of LTD benefits.  (*See* AR at 632-33.) However, the court considers its impact because it was likely considered by Hartford on appeal and is now part of the full record before the court.

[10] Ms. Reetz asks the court to consider a letter from Dr. Marquadt dated December 27, 2017, in which Dr. Marquadt clarifies that she erred in filling out this portion of the APS.  (*See* Pl. Resp. at 12-13; Crawford Decl. (Dkt. # 34) ¶ 2, Ex. 1.)  As Hartford aptly argues, this evidence was not and could not have been part of the administrative record.  (*See* Def. Reply (Dkt. # 35) at 3.)  The court need not consider this extra-record evidence because the record evidence is sufficient to find that this response on the May 2016, APS form was likely error.

1    But most critically, Hartford's narrative, extrapolated from this one response,

2    contradicts the medical notes leading up to the APS.  Indeed, the very same day that she

3    filled out the APS, Dr. Marquadt remarked in her notes that "things have been worse";

4    Ms. Reetz "cannot sit for long periods of time," and she is "still having a lot of difficulty

5    with the combination of her lumbar issues, as well as her fibromyalgia."  (*Id.* at 761-63.)

6    Dr. Marquadt even stated that she "did not agree with the final assessment . . . of [Ms.

7    Reetz] being able to work full time," specifically because Dr. Marquadt did not agree that

8    Ms. Reetz could work an eight-hour day.  (*See id.* at 762; *see also id.* at 724 (responding

9    that Ms. Reetz could not work for eight hours per day).)  Dr. Marquadt noted that she

10   "filled out a new PCE"[11] to communicate her disagreement with the disability

11   assessment.  (*Id.* at 763.)

12        In light of the rest of the APS form and the concurrent medical notes, it is

13   unreasonable to infer that Dr. Marquadt suddenly concluded Ms. Reetz's sitting ability

14   improved eight-fold—from 30 minutes to 240 minutes.  It is equally unreasonable to infer

15   that Dr. Marquadt's failure to circle a number equates to an assessment that Ms. Reetz

16   could work an eight-hour day, especially when Dr. Marquadt rejected that very

17   conclusion on the same day.  Thus, the court finds that Dr. Marquadt's response on the

18   May 2016, APS form, considered in the context of the rest of the record, does not

19   outweigh the evidence of non-improvement.  *See Rabbat v. Standard Ins. Co.*, 894 F.

20   Supp. 2d 1311, 1320 (D. Or. 2012) (rejecting the administrator's reliance on the

21

22   _____

     [11] This "PCE" refers to the APS that Dr. Marquadt filled out on May 11, 2016.  (*See* AR
     632-33.)

physician's failure to complete portions of the forms because other parts of the record indicated that the physician "unambiguously concluded that [the claimant] was incapable of working and that his condition would never improve").

Hartford's other indications of improvement are similarly unpersuasive. First, Hartford points to various positive evaluations made by Ms. Read, Ms. Reetz's physical therapist. (*See* Def. Mot. at 8 (citing AR at 876, 590, 594); Def. Resp. at 3 (citing AR at 590).) These positive remarks, however, were limited to Ms. Reetz's knee; on those same days, Ms. Read recognized that Ms. Reetz was experiencing a "fibromyalgia flare up." (AR at 876; *see id.* at 590, 592.) Second, Hartford points out that various physicians advised Ms. Reetz to increase exercise and find work. (*See* Def. Mot. at 8 (citing AR at 595, 863); Def. Resp. at 3 (citing AR at 860).) But setting a functional goal is not expressing an opinion on Ms. Reetz's current capabilities, nor is it evidence of improvement. Third, Hartford suggests that Dr. Marquadt doubted Ms. Reetz's spondyloarthropathy diagnosis. (Def. Mot. at 8 (citing AR at 768).) The record conveys otherwise. Rather than doubting the spondyloarthropathy diagnosis, Dr. Marquadt was explaining to Ms. Reetz that a certain laboratory result does not rule out spondyloarthropathy. (AR at 768.) And lastly, Hartford relies on Ms. Reetz's self-evaluation that "things are going much better" on May 17, 2016. (Def. Mot. at 8; Def. Resp. at 3 (citing AR at 866).) Hartford takes this statement out of context. Ms. Reetz made this statement to her social worker, Ms. Cathlyn Rios, about her mental state, not her fibromyalgia or chronic pain. (*See* AR at 866.) When speaking about her pain, Ms. Reetz tells Ms. Rio that "she had some rough days . . . last week," including one day

1  when the pain kept her in bed all day.  (*Id.*)  Thus, in proper context, Ms. Reetz's

2  statements to Ms. Rios show a lack of improvement.

3      Finally, in addition to Ms. Reetz's inability to sit for prolonged periods and her

4  lack of improvement, Ms. Reetz's award of SSDI benefits, based on an ALJ's June 29,

5  2016, ruling, buttresses her showing.  "Social Security disability awards do not bind plan

6  administrators, but they are evidence of disability."  *Salomaa v. Honda Long Term*

7  *Disability Plan*, 642 F.3d 666, 679 (9th Cir. 2011).  Even if the standards under the Plan

8  and those applied by the SSA differ, the SSDI decision should not be disregarded in its

9  entirety.  *Bledsoe*, 90 F. Supp. 3d at 916.  Here, the ALJ determined that Ms. Reetz was

10  disabled as of March 7, 2014.  (*Id.* at 565-69.)  Although this award is not dispositive, the

11  SSDI benefits award constitutes evidence of Ms. Reetz's disability and further supports

12  Ms. Reetz's showing.[12]

13      Hartford bases its termination decision on the opinions of the independent

14  reviewing physicians, including, as relevant here, Dr. Khanna and Dr. Schiopu.  (*See* AR

15  at 327-28.)  The court finds Dr. Khanna's report minimally persuasive.  First, Dr. Khanna

16  did not examine Ms. Reetz in person.  Although there is no "treating physician rule" in

17  ERISA cases, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), "this

18  does not mean that a district court, engaging in a *de novo* review, cannot evaluate and

19

20      _____
    [12] This is true even where "the administrative record does not contain a copy of the award
21  letter so that the plan administrator can review the SSA's reasoning."  *See Rabbat*, 894 F. Supp.
    2d at 1323.  Thus, even though the record does not contain a copy of the ALJ's written ruling,
    the fact that the SSA awarded Ms. Reetz SSDI benefits constitutes evidence of disability.  (*See*
22  11/8/17 Order (Dkt. # 28) at 9 (noting that the SSA determination would be somewhat relevant).)

give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative," *Paese v. Hartford Life & Accident Ins. Co.*, 449 F. 3d 435, 442 (2d Cir. 2006). Here, the treating physicians' relationship with Ms. Reetz allowed them to personally observe the effects of Ms. Reetz's diagnoses and assess the credibility of her reports of pain. In contrast, Dr. Khanna, because she did not personally examine Ms. Reetz, could not have observed the fibromyalgia's effect or assessed Ms. Reetz's credibility. Thus, the court finds that the treating physicians' medical opinions to be more reliable and probative of Ms. Reetz's condition than Dr. Khanna's report.[13] *See Oldoerp*, 12 F. Supp. 3d at 1250 ("[W]hen an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions.").

Moreover, the court finds troubling that Dr. Khanna draws on Dr. Marquadt's reports but reaches different conclusions without any explanation. *See Nord*, 538 U.S. at 834 (holding that administrators may not "arbitrarily refuse to credit" opinions of treating physicians). The court recognizes that Dr. Khanna agrees with Dr. Marquadt on several points. (*See* AR at 711.) Nonetheless, there remain some key differences. For instance, Dr. Khanna concludes that Ms. Reetz can lift, carry, push, and pull up to ten pounds "on a frequent basis." (*Id.*) This conclusion was later utilized by Hartford to justify its determination that Ms. Reetz could do her own occupation. (*See id.* at 338.) But this

---

[13] The parties further disagree on whether Dr. Khanna spoke to Dr. Marquadt in preparing her report. (*See* Pl. Resp. at 7; Def. Reply at 5-6.) The court does not need to decide this issue because even assuming Dr. Khanna spoke to Dr. Marquadt, the interaction was minimal and does not outweigh the in-person interactions of the treating physicians.

opinion contradicts Dr. Marquadt's assessment, which indicated that Ms. Reetz could only lift up to ten pounds "occasionally." (*See id.* at 1041.) Moreover, Dr. Khanna concludes that Ms. Reetz can perform her job functions for eight hours per day, 40 hours per week. (*Id.* at 711.) Dr. Marquadt unequivocally rejected such a conclusion.[14] (*Id.* at 724.) Because the ability to work a full work-week is considered an essential duty, this disagreement carries significant implications. (*See id.* at 21.) Dr. Khanna offers no explanation for either of these discrepancies.[15] (*See id.* at 704-13.)

The court likewise gives little weight to Dr. Schiopu's opinion. Like Dr. Khanna, although Dr. Schiopu reviewed Ms. Reetz's medical records, she did not examine Ms. Reetz in person. (*See id.* at 518-22.) Moreover, she gives no support for her conclusion that Ms. Reetz "could sit continuously, without any limitations," which differs drastically from Dr. Marquadt's conclusion. (*See id.* at 522.)

In short, Hartford concluded that Ms. Reetz could perform the essential duties of her own job based on the opinions and reports of independent reviewing physicians who

---

[14] It is possible that Dr. Khanna did not review this conclusion because Dr. Marquadt submitted it on February 22, 2016 (*see* AR at 723-24), and Dr. Khanna claims to have only reviewed records from January 3, 2014 to August 14, 2015. (*Id.* at 704.) The parties dispute whether Dr. Khanna's assertion is true. (Pl. Mot. at 15-16; Def. Resp. at 6.) Regardless, the statement cuts against the reliability of Dr. Khanna's report. On one hand, if the assertion is true, then the court finds cause for concern that Dr. Khanna considered an incomplete medical record. *See Bledsoe*, 90 F. Supp. 3d at 915 n.6. On the other hand, if Dr. Khanna did review records after August 14, 2015, there remains no explanation for why she reached a different conclusion regarding whether Ms. Reetz could work an eight-hour day.

[15] The parties also dispute whether Dr. Khanna's conclusion—that Ms. Reetz could sit for "up to six hours" (AR at 711)—is different from Dr. Marquadt's conclusion—that Ms. Reetz could sit for four to six hours (*id.* at 1041). (*See* Pl. Mot. at 14; Def. Resp. at 5.) The court finds that even if Dr. Khanna's conclusion on this point mirrors that of Dr. Marquadt's, the other discrepancies lead the court to assign Dr. Khanna's opinion less weight.

minimally corresponded, if at all, with the treating physician, did not conduct in-person examinations, and offered no explanation for reaching conclusions contrary to those of the treating physician. Dr. Marquardt, on the other hand, has supplemented the record with reports that indicate Ms. Reetz suffers from a chronic illness that flared up in 2016 and worsens with prolonged sitting. The court is hard-pressed to not find Dr. Marquadt's reports, in addition to those of the other treating physicians, more influential, especially in light of Hartford's past determination that Ms. Reetz was disabled. Accordingly, the court is persuaded that Ms. Reetz, more likely than not, was disabled under the Plan's terms from April 28, 2016, to June 5, 2016.

     2. <u>Any Occupation</u>

To obtain LTD benefits beyond June 5, 2016, Ms. Reetz must establish by a preponderance of the evidence that a sickness prevented her from performing the essential duties of any occupation for which she is qualified. (*See* Def. Mot. at 7-8; AR at 21.) The court finds that Ms. Reetz has met this burden as well and is thus also entitled to the restoration of her LTD benefits after June 5, 2016.

Hartford's EAR identified ten sedentary level occupations, including a data compiler, a proofreader, and an insurance clerk, that it alleges Ms. Reetz can perform. (AR at 668.) The Ninth Circuit held that "an employee who cannot sit for more than four hours in an eight-hour workday cannot perform 'sedentary' work that requires 'sitting most of the time.'" *Armani v. Nw. Mutual Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016). This holding derives from the "logical conclusion that an employee who is unable to sit for more than half of the workday cannot consistently perform an occupation that

requires sitting for 'most of the time.'" *Id.* The Ninth Circuit also recognized that some courts have held that "'sedentary work' generally requires the ability to sit for at least six hours.'" *Id.*; *see also Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661(GEL), 2009 WL 222351, at *18 (S.D.N.Y. Jan. 30, 2009) (recognizing a sitting tolerance of six hours per day as "generally recognized as the minimum tolerance required for sedentary work" according to the Department of Labor).

In determining whether Ms. Reetz is capable of performing a sedentary level job, the court again accords significant weight to the evaluation of Ms. Reetz by her treating physicians, including Dr. Marquadt. As discussed above, Dr. Marquadt has repeatedly concluded that Ms. Reetz can sit for only 30 minutes at a time for a total of less than six hours a day. *See supra* § III.B.2; (*see* AR at 723, 1041.) These evaluations of Ms. Reetz persuade the court that she could not continuously engage in any occupation for which she was qualified. Because Ms. Reetz can only sit for half-an-hour at a time for, at most, six hours a day, the court is not convinced that she can perform any sedentary level occupation. Even if she could sit for more than six hours a day, she would need the significant accommodation of taking breaks every half an hour. Thus, it is not likely, as Hartford asserts, that Ms. Reetz could complete sedentary-level duties with her documented inability to sit for prolonged periods of time. *See Schramm*, 718 F. Supp. 2d at 1163 (finding claimant who could only sit for less than six hours a day could not complete the essential duties of sedentary occupations).

Hartford maintains that the EAR Ms. Fleisher conducted took into account Ms. Reetz's various limitations, including her inability to sit for more than six hours a day.

(*See* Def. Resp. at 7-8; Def. Reply at 8.) And while Hartford is correct that the EAR

quoted Dr. Khanna's conclusions regarding Ms. Reetz's sitting limitations, there is no

indication that these limitations were factored into the subsequent job search. Ms.

Fleisher only made four adjustments that were "based on the claimant's work and

education history and the response from [Dr. Khanna's] report." (AR at 664.) None of

these adjustments pertained to Ms. Reetz's inability to sit for prolonged periods of time.

(*See id.*) Ms. Fleisher then eliminated the jobs that required "additional training or

experience" and those that involved "standing and walking over 2 hours total/day."[16]

(*Id.*) Again, none of these eliminations took sitting limitations into account. Thus,

although Ms. Fleisher restated Ms. Reetz's sitting limitations in the report, there is no

suggestion that it was factored into the job search itself.

    Moreover, the EAR relied on some of Dr. Khanna's conclusions that contradicted

those of Dr. Marquadt and thus may not have accurately returned jobs that could be

performed by Ms. Reetz. First, Ms. Fleisher adjusted Reaching, Handling, and Fingering

ability to "constantly" (*id.* at 663), even though Dr. Marquadt has consistently remarked

that Ms. Reetz can only do so "occasionally" (*id.* at 723, 1041). Second, Ms. Fleisher

assumed Ms. Reetz can work for the full eight-hour day, forty-hour work week (*id.* at

663), whereas Dr. Marquadt concluded that Ms. Reetz cannot perform functions for the

full work week (*id.* at 724). Because the ability to work a full work week is recognized

---

[16] Logically, if Ms. Fleisher eliminated all jobs that involved over two hours of standing and walking a day, she also eliminated jobs that involved less than six hours of sitting a day. Thus, rather than taking Ms. Reetz's sitting limitations into account, Ms. Fleisher seems to have done just the opposite: eliminated jobs that would have involved less sitting.

under the Plan as an essential duty (*id.* at 21), Ms. Reetz's inability to do so greatly affects whether she can perform any of the listed jobs. In short, the court finds that the search did not accurately reflect Ms. Reetz's limitations, and thus, the court is not convinced that the jobs returned by the search are ones that Ms. Reetz can perform.

Based on the record before it, the court does not believe that Ms. Reetz can work any of the positions in the EAR, or any sedentary job, on a full-time basis. Accordingly, Ms. Reetz is entitled to the reinstatement of her LTD benefits beginning on June 5, 2016. Combined with the court's ruling above, the court finds that Ms. Reetz is entitled to the reinstatement of her LTD benefits beginning on April 28, 2016.

### 3. Prejudgment Interest and Attorney's Fees

A district court may award prejudgment interest in ERISA cases to compensate a claimant for the loss she incurred as a result of the administrator's nonpayment of benefits. *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001). Whether to award prejudgment interest "is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan*, 750 F.2d 1458, 1465 (9th Cir. 1985) (quoting *Wessel v. Buhler*, 437 F.2d 279, 284 (9th Cir. 1971)). Generally, "the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Rabbat*, 894 F. Supp. 2d at 1323 (quoting *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007)) (internal quotation marks omitted).

The court finds that Ms. Reetz is entitled to receive LTD benefits from April 28, 2016, to recover pre-judgment interest on those unpaid benefits consistent with the rate prescribed for post-judgment interest under 28 U.S.C. § 1961, and to recover her attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

## IV.    CONCLUSION

For the foregoing reasons, the court ORDERS as follows:

1. The court DENIES Hartford's motion for judgment (Dkt. # 31);

2. The court GRANTS Ms. Reetz's motion for judgment (Dkt. # 29).  Ms. Reetz is entitled to receive LTD benefits as of April 28, 2016, to recover pre-judgment interest on those unpaid benefits, and to recover attorney's fees and costs; and

3. Ms. Reetz is DIRECTED to file a motion for attorney's fees no later than ten (10) days after the entry of this order.  The motion shall be supported by evidence reflecting the reasonable amount of fees sought, and shall include argument as to the authority upon which such fees may be granted.  Hartford shall file a response, if any, in accordance with the Local Rules, and Ms. Reetz may file a reply in accordance with the same.

Dated this 16th day of February, 2018.

_____
JAMES L. ROBART
United States District Judge